IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM JOSEPH CUNNINGHAM, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 04-119 Erie |
| ) | JUDGE SEAN McLAUGHLIN |
| WILLIAM STICKMAN, et al., ) | MAGISTRATE JUDGE BAXTER |
| ) | |
| Respondents. ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION**

It is recommended that the Petition for Writ of Habeas Corpus be dismissed and that a certificate of appealability be denied.

**II.    REPORT**

This is a petition for writ of habeas corpus filed by a state prisoner presently incarcerated at the State Correctional Institution at Pittsburgh, Pennsylvania. The Commonwealth has responded to the petition (Docket #11) and it is now ripe for disposition.

   **1.    Procedural history.**

Petitioner was found guilty by a jury of second degree murder, aggravated assault, recklessly endangering another person and rape on January 27, 2000, in relation to the strangulation death of Patricia Fletcher. The evidence presented at trial was summarized by the trial court as follows:

> The evidence of record [footnote omitted] shows that on July 1, 1999, the Defendant went to the Lonestar Steakhouse and Saloon in Millcreek Township, Erie County, Pennsylvania. He was there for about 3 hours, drank 4-6 beers and left after the bartender refused to further serve him. At about 6:00 p.m., the Defendant went to Hut's Place, a bar located in Erie, Pennsylvania. He was falling asleep at the bar when Patricia Fletcher (the victim) and Gary Adams arrived. Although they did not know the Defendant, they woke him up and conversed with him. Over the course of their stay, the Defendant bought them drinks. The trio left Hut's Place sometime after midnight and went to the Ash Street Pub to purchase beer. From there, they went to 25th and German Streets

where the Defendant purchased crack cocaine. They then went to the Defendant's apartment. Shortly after their arrival, Mr. Adams left because Fletcher was going to have sex with the Defendant in exchange for the drugs. He waited for her in the parking lot for about 45 minutes before leaving.

The next day the Defendant was at Joseph Cunningham's (the Defendant's brother) club. Mr. J. Cunningham testified that the Defendant was upset and intoxicated. The Defendant asked him to accompany him to his apartment because there was a dead girl there. He did and when they arrived he saw the victim lying on the bed. He advised the Defendant to call the police, which he did.

The police arrived at about 4 a.m. on July 3, 1999. The Defendant informed the officers that he had picked up a female prostitute the night before. He stated that he didn't have sex with the woman because he was locked out of his apartment when he left to retrieve his keys from the woman's boyfriend. He invited them [the police] into the apartment, which seemed neat and tidy. In the bedroom, the officers observed the victim lying on the bed. She was not breathing and exhibited obvious signs of trauma. She was lying on her back with her arms over her head and her legs spread. Her face was swollen and there was blood on her face and forearms. She was wearing a t-shirt but was nude from the waist down. However, there was a pair of sweatpants folded across her groin. Her panties, which had been neatly cut, were found under a pillow. Upon rolling over her body, the police found her left upper incisor lying under her body. See, Commonwealth's Exhibit 40. The officers observed that the Defendant was nervous and quiet. They further observed that he had scratches on his neck, nose, arms, and hands. In their opinion, he was not intoxicated.

At about 7:45 a.m. after the Defendant agreed to provide a written statement (See, Commonwealth's Exhibit 28), he was taken to the Millcreek Police Station where he was administered his Miranda rights and consented to a videotaped statement. See, Commonwealth Exhibit 32. During the interview, the Defendant confessed to killing Fletcher but stated that he did not recall what exactly happened.

Dr. Eric Vey, an expert in forensic pathology, testified that during the autopsy he discovered that the victim had suffered 14 blunt trauma injuries to her extremities, consisting of various contusions and abrasions. She had marks on her arms consistent with those caused by a tight grasp. She also had 8 blunt force trauma injuries to her head and neck. Specifically, she had bruises around her neck, lacerations on her lips, and her left upper incisor was missing. The internal examination of her body revealed a number of hemorrhages in all 8 layers of her neck muscles. The hyoid bone in her neck was broken. She had numerous rib fractures. Furthermore, she had 3 contusions and lacerations of her vagina and she had contusions on her labia. Dr. Vey stated that it was his opinion that the victim's injuries were consistent with the use of force and the cause of her death was asphyxiation due to strangulation.

Jeffrey Fumea, an expert in DNA profiling and analysis, testified that DNA extracted from semen found on a towel in the Defendant's bathroom matched the DNA of the Defendant's blood sample. Furthermore, John A. Robertson, an expert in blood cytology, hair comparison, and forensic chemistry, testified that the 2 pubic hairs recovered from the victim's shirt and pubic area matched samples taken from the Defendant.

(Trial Court Opinion of July 11, 2000, attached as unmarked exhibit to Docket #11).

The court imposed a mandatory sentence of life imprisonment on February 29, 2000. Post-trial motions were filed and denied, and petitioner filed a statement of matters complained of on appeal which included the following claims:

1. The charge of Forcible Rape should have been dismissed for lack of proof of the use of force;

2. The evidence presented at trial was insufficient to establish rape;

3. The evidence was insufficient to establish felony-murder since there was not sufficient evidence to prove a rape had occurred;

4. The court erred in denying the motion for change of venue;

5. The court erred in failing to suppress Defendant's written and videotaped statements since he was intoxicated at the time and unable to understand and properly waive his right against self-incrimination.

("Final Statement of Matters Complained of on Appeal" dated July 20, 2000, attached as unmarked exhibit to Docket #11). The trial court, after setting forth the elements of the crimes of rape and second-degree murder, found that those elements were satisfied by the following evidence:

(1) the victim suffered numerous blunt force injuries including: fractured ribs, scrapes and abrasions to her arms, bruises to her neck, cuts to her mouth, and her left upper incisor was knocked out;

(2) the victim's internal neck muscles were bruised and her hyoid bone was broken, consistent with a cause of death of asphyxiation due to strangulation;

(3) the victim suffered injuries to her genitalia, including contusions to her labia and a laceration/tear of her vagina;

(4) police found the victim in the Defendant's apartment, lying on his bed naked from the waist down;

(5) the crotch of the victim's panties had been cut with scissors or a sharp knife;

(6) pubic hairs found on the victim's body matched hair samples taken from the Defendant;

(7) both Gary Adams and Lisa Gore saw the Defendant with the victim on the night in question;

(8) the Defendant had numerous abrasions to his arms, neck, and face, from which the jury could infer that the victim resisted;

(9) the Defendant admitted having sexual intercourse with the victim in his apartment (See, Commonwealth Exhibit 28): and

3

    (10) the Defendant admitted killing the victim.

(Trial Court Opinion at 8-9).  The court also rejected the claim concerning a change of venue on the basis that Petitioner had only cited one newspaper article, published five months prior to trial, which noted petitioner's confession to the crime.  The court further found that none of the jurors seated were actually tainted by pre-trial publicity, and "each stated that they could decide the case based upon the evidence presented and the applicable law." (Id. at 11).

    On direct appeal, petitioner, represented by new counsel, challenged the sufficiency of the evidence and the court's refusal to grant a change of venue or venire (Petitioner's Superior Court Brief, attached as unmarked exhibit to Docket #11).  The Superior Court affirmed the judgment of sentence on July 3, 2001, by fully adopting the rationale set forth in the trial court's opinion (Superior Court Opinion of July 3, 2001, attached as unmarked exhibit to Docket #11).  The Superior Court made no independent findings or conclusions.  Petitioner's subsequent petition for allowance of appeal was denied by the Supreme Court of Pennsylvania on January 3, 2002.

    Petitioner next filed a petition pursuant to the Post Conviction Relief Act (PCRA) on October 28, 2002, in which he raised several claims:

  1. Prosecutorial misconduct in presenting the testimony of petitioner's brother, Joe Cunningham, which was materially different than the earlier statements made to police, and which was not disclosed to petitioner prior to trial;

  2. Ineffective assistance of counsel in the following respects:

    A. Failing to object or move for a mistrial or a continuance when Joe Cunningham's testimony was described in the prosecutor's opening statement;

    B. Failing to adequately cross-examine Joe Cunningham regarding his inconsistent statements;

    C. Failing to object to the jury charge on the degrees of murder.

  3. Trial court error in reinstructing the jury on the degrees of murder.

Counsel was appointed, and an amended petition was filed, wherein petitioner also asserted that he had been denied a fair trial when his taped confession was played for the jury, but was not transcribed.

    The trial court denied PCRA relief on January 7, 2003.  The court found that petitioner and counsel both had access to the taped confession at trial and, accordingly, he was not prejudiced by

4

the lack of a transcription (Trial Court Opinion of January 7, 2003 at 3). The court also found that the Commonwealth did not commit misconduct in presenting Joe Cunningham's testimony. Defense counsel had access to, and used, the witness's prior inconsistent statements during cross-examination. The court also reviewed its charge to the jury on the elements of third degree murder, and found that the charge, read as a whole, was accurate such that counsel was not ineffective for failing to object to the charge. (Id. at 7-8).

On appeal, petitioner raised three claims of ineffective assistance restating the claims made in the lower court concerning the Commonwealth's opening statement, the alleged failure to cross-examine Joe Cunningham with his prior inconsistent statement, and the claim that the trial court erroneously instructed the jury on the elements of third degree murder. The Superior Court affirmed on September 8, 2003, finding that there was no prosecutorial misconduct in accurately summarizing Joe Cunningham's testimony, nor was there any duty to disclose prior to trial that Joe Cunningham would testify in a manner inconsistent with his written statements (Superior Court Opinion at 4-5). The court also found that defense counsel did cross-examine Joe Cunningham with his inconsistent statements and, accordingly, counsel was not ineffective in this respect (Id. at 7). Finally, the court reviewed the instructions to the jury and found them to be in conformity with Pennsylvania law concerning the definition of third degree murder. Counsel was found not to have rendered ineffective assistance in failing to object to the charge in this respect (Id. at 8-9). Petitioner's subsequent petition for allowance of appeal to the Pennsylvania Supreme Court was denied on April 13, 2004.

Petitioner now files the instant petition for writ of habeas corpus and presents the following seven claims:

1. Evidence was constitutionally insufficient to sustain conviction of rape and homicide.

2. Trial court committed error by refusing a change of venue due to pretrial publicity.

3. Trial counsel was ineffective by virtue of his failure to request a continuance to obtain statement withheld by the prosecutor to impeach a Commonwealth witness, Joe Cunningham.

4. Trial counsel was ineffective by virtue of his failure to impeach a Commonwealth witness, Joe Cunningham.

5

  5. Trial counsel was ineffective by virtue of his failure to object to a defect in jury instructions on the elements of third-degree murder.

  6. Petitioner was denied due process because his videotaped statement was not transcribed.

(Docket #3, Memorandum at i).

  **2.** **Exhaustion and procedural default.**

  The first issue in any habeas corpus proceeding instituted by a state prisoner is whether the petitioner has exhausted his state court remedies. Exhaustion requires that the claims presented in the federal court have been presented in substantially the same form to the state's highest court, with identity of both facts and legal theory. Bond v. Fulcomer, 864 F.2d 306 (3d Cir. 1989). Even if the claims have been so presented to the state's highest court, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. §2254(c); Castille v. Peoples, 489 U.S. 346 (1989). And, although the requirement is not jurisdictional, it "should be strictly adhered to because it expresses respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." Landano v. Rafferty, 897 F.2d 661, 669 (1990). The requirement also recognizes the duty, and ability, of the state courts to uphold federal law, and serves the interest of ensuring a fully developed record in the state court. Id. "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).[1] Finally, a federal habeas court is required to dismiss a petition which contains both exhausted and unexhausted claims. Rose v. Lundy, 455 U.S. 509, 510 (1982); Landano v. Rafferty, supra.

---

[1] The Pennsylvania Supreme Court's Order No. 218, issued May 9, 2000, provides that a criminal defendant shall not be required to petition for an allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies for purposes of federal habeas corpus review. Federal courts within this Circuit have consistently applied the Pennsylvania Supreme Court's Order.

Here, all of petitioner's claims have been presented to the state courts. His final claim, that he was denied a fair trial due to the lack of a transcript of his videotaped confession, however, was not presented on appeal from the denial of PCRA relief. Thus, state court remedies have not been exhausted with respect to this claim. At this point, though, petitioner does not possess any means of obtaining review of his unexhausted claim in the state courts since a new PCRA petition would be untimely. Accordingly, his failure to exhaust may be excused. "If a claim has not been fairly presented to the state courts but further state-court review is clearly foreclosed under state law, exhaustion is excused on the ground of futility. See, e.g., Lines v. Larkins, 208 F.3d 153, 160 (3d Cir.2000); Toulson v. Beyer, 987 F.2d 984, 987-88 (3d Cir.1993)." Wenger v. Frank, 266 F.3d 218, 223 (3d Cir. 2001).

Like the exhaustion requirement, the procedural default doctrine is based upon notions of comity and federalism. The procedural default barrier rests upon the "independent and adequate state grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

A state's procedural rules are entitled to deference by federal courts, and violation of a state procedural rule may constitute an independent and adequate state ground for denial of federal review of habeas claims. Coleman v. Thompson, 501 U.S. at 750. Violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court has concluded that a petitioner is procedurally barred from raising his claims. Glass v. Vaughn, 65 F.3d 13, 15 (3d Cir. 1995), cert. denied, 116 S.Ct. 1027 (1996).

Federal habeas review is not available to a petitioner whose constitutional claims have not been addressed on the merits due to procedural default unless such petitioner can demonstrate: 1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or 2) failure to consider the claims will result in a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman v. Thompson, 501 U.S. at 750.

Petitioner's failure to seek review of his transcription claim in the Superior Court of Pennsylvania after the denial of PCRA relief is a state court default barring habeas review absent a

7

showing of cause and prejudice. To satisfy the cause standard, petitioner must demonstrate that some objective factor external to the defense impeded his efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. 467, 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). Neither a deliberate strategic decision nor an inadvertent failure of counsel to raise an issue constitutes "cause" unless counsel's performance failed to meet the Sixth Amendment standard for competent assistance. Engle v. Isaac, 456 U.S. 107 (1982); Carrier, 477 U.S. at 485-87.

Here, petitioner cannot establish cause for his default since he filed his appeal from the denial of PCRA relief pro se. The decision not to raise this claim was his own and the failure was not the result of some external impediment. Since Petitioner has failed to establish cause for his procedural default, the Court need not consider the question of actual prejudice. See Murray, 477 U.S. at 533.

Although petitioner cannot demonstrate the necessary "cause" and "prejudice," this Court may still review his claims if he can show that a "fundamental miscarriage of justice would result from a failure to entertain the claim." McCleskey, 499 U.S. at 495. This Court may use its discretion to correct a fundamental miscarriage of justice if it appears that a "constitutional violation probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. See also Coleman, 501 U.S. at 748; McCleskey, 499 U.S. at 502. Under the "miscarriage of justice" standard, a petitioner must present new evidence of innocence and persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. Schlup v. Delo, 513 U.S. 298, 329-30 (1995); Glass, 65 F.3d at 15. This is a stronger showing than is required to establish prejudice and is found only in a truly "extraordinary" case. Schlup, 513 U.S. at 321. To succeed on an actual innocence claim, a petitioner must invoke "reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998), and "show that it is more likely than not that no reasonable juror would have convicted him in light of new evidence presented in his habeas petition." Schlup, 513 U.S. at 327.

Petitioner does not argue "actual innocence" in his petition. Rather, he asserts that the lack of a transcript of his confession to the killing, even though he and his counsel had access to the videotape itself, prevented him from presenting a defense. Petitioner does not explain how his defense was actually inhibited nor does he indicate how a transcript would have aided his defense. Far from

8

proving that he is actually innocent of the crimes charged, Petitioner has not even established that his defense was prejudiced in any way. This claim does not meet the Schlup standard, and petitioner is not entitled to the miscarriage of justice exception. Petitioner's claim concerning the lack of a transcript of his videotaped confession is barred from review due to the procedural default.

### 3. Merits.

Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations. 28 U.S.C. § 2254. Specifically, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. Id. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

A federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the independent meanings of the "contrary to" and "unreasonable application" clauses contained within § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 411-413. The Supreme Court further clarified that a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. Id. at 409. "Under §2254(d)(1)'s unreasonable

application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

1.      **Sufficiency of the evidence.**

Where a petitioner challenges his incarceration on the ground that the evidence was insufficient to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Accord Moore v. Deputy Commissioner(s) of SCI-Huntington, 946 F.2d 236, 243 (3d Cir. 1991), cert. denied, 503 U.S. 949 (1992). A federal court must apply this standard "'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Orban v.Vaughn, 123 F.3d 727, 731 (3d Cir. 1997) (quoting Jackson, 443 U.S. at 324 n. 16). The finder of fact, however, weighs the evidence and the federal courts must defer to its resolution of conflicts in the evidence. Jackson, 443 U.S. at 326.

The test for sufficiency of evidence is the same under both Pennsylvania and federal law. See Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992), cert. denied, 506 U.S. 1089 (1993); Commonwealth v. Bricker, 525 Pa. 362, 581 A.2d 147 (1990) (an appellate court must determine whether the evidence, and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses charged). On direct appeal, the trial court employed this standard in deciding the sufficiency issues raised by Petitioner.[2] The circumstantial evidence that Petitioner forcibly raped

---

[2]     Petitioner argued that there was insufficient proof that sexual intercourse occurred at all or, in the alternative, that force was used to obtain sex. In this way, Petitioner challenged the convictions both of rape and of felony-murder. If no rape occurred, either because no sexual penetration occurred or

and then killed the victim, as summarized by the trial court, is not only sufficient for a "rational trier of fact . . . [to find] the essential elements of the crime beyond a reasonable doubt", it is, indeed, overwhelming. The injuries to and condition of the deceased's body, its position, as well as the injuries suffered by the petitioner, all point to the savage, ultimately fatal sexual assault on which the jury verdict was based. The state court's determination that sufficient evidence supports the convictions in this case is neither contrary to nor an unreasonable application of established federal law.

**2.    Change of venue.**

Petitioner asserts that he was entitled to a change of venue due to pre-trial publicity in this case.[3]

Generally, the trial court's determinations regarding "... juror impartiality may 'be overturned only for manifest error.'" Mu'Min v. Virginia, 500 U.S. 415, 428 (1991). "It is not required ... that the jurors be totally ignorant of the facts and issues involved." Irvin v. Dowd, 366 U.S. 717, 723 (1961). However, in some cases, adverse pretrial publicity may become so extreme that the reviewing court must presume prejudice to the criminal defendant. Patton v. Yount, 467 U.S. 1025, 1031 (1984); . "Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir.1992). In order to presume prejudice, the community reaction or media coverage must have been so hostile or pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury. Id. at 1252-53. Such cases of pervasive media coverage so infecting the venire are "exceedingly rare." Flamer v. Delaware, 68 F.3d 736, 754 (3d Cir.1995). In the absence of such pervasive and hostile publicity mandating a presumption of prejudice, a petitioner may show that he suffered actual prejudice in that "those who served on his jury could not reach an impartial verdict based

---

because no force was used, then both convictions would be unsupported.

[3]    In his state court proceedings, Petitioner attached only one newspaper article, as an example of the taint of the pretrial publicity. However, on habeas review, Petitioner has provided copies of six undated newspaper articles in support of his claim. Docket # 3, Attachment B.


solely on the evidence presented at trial." Pursell v. Horn, 187 F.Supp.2d 260, 301 (W.D. Pa. 2002). In determining whether there is actual prejudice, the reviewing court must examine "... the totality of the circumstances, including the voir dire of the jury." Murphy v. Florida, 421 U.S. 794, 799-901 (1975).

In this case, the state court applied the correct federal standard (as cited in Commonwealth case law) and concluded that " ... publicity was not so extensive, sustained or pervasive that it precluded the impaneling of a fair and impartial jury" [Docket # 11, unnumbered attachment, Memorandum Opinion dated July 26, 2000[4]] or, in other words, that the publicity was not so pervasive that prejudice should be **presumed**.[5] The state court further concluded that Cunningham had not been **actually** prejudiced by the media coverage in that

> Of the venire persons interviewed by the court and both counsel during voir dire, one (1) venire person had to be dismissed because he had substantial knowledge of the case which he could not set aside. [...] Moreover, none of the jurors selected were tainted by any pre-trial publicity and each stated that they could decide the case based upon the evidence presented and the applicable law.

Id.

In fact, a review of the state court record reveals that of the venire, only seven people mentioned exposure to media coverage of this case. Of those seven individuals, three were confusing the facts of

---

[4] This issue was presented on direct appeal. Because the Superior Court did not make any independent conclusions or findings, this Court must examine the trial court's opinion on the statement of matters complained of on appeal in order to ascertain whether the state court decision is contrary to or an unreasonable application of federal law.

[5] The inclusion of additional newspaper articles before this Court does not call this conclusion into question as despite the trial court's reference to only one news article. The trial judge was clearly aware of the full extent of the media coverage as evidenced by his questioning during voir dire. See Mu'min, 500 U.S. at 427 ([O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity [...] Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The court, of course, does not impute his own perceptions of the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.").

12

Petitioner's case with another murder.[6] Of the four individuals who actually remembered coverage of this case, one was dismissed, two were impaneled as jurors and one as an alternate. The three who served (John Celeski, Karen Burns, and Patricia Smith) all were asked whether or not they could set aside any preconceived notions regarding Cunningham's guilt or innocence. All three indicated that they could serve impartially. See Voir Dire Transcript, January 20, 2000, pages 43, 55, and 138, respectively).

This Court concludes that the state court's determination on this issue is not contrary to or an unreasonable application of established federal law.

### 3. Ineffective assistance of counsel.

Petitioner's remaining claims are framed in terms of ineffective assistance of counsel. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).

> Thus the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Fretwell, 506 U.S. at 369 (citing United States v. Cronic, 466 U.S. 648, 658 (1984)). See also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney,

---

[6] This fact supports the state court's conclusion that pre-trial publicity was not so pervasive as to support a presumption of prejudice.

it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Strickland, 466 U.S. at 690. A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof. Cronic, 466 U.S. at 658.

The first prong of the Strickland test requires a petitioner to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id.

The second prong requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

First, Petitioner makes two related claims: (1) that counsel was ineffective for failing to request a continuance after the prosecution's opening statement so that he could prepare a defense to petitioner's brother's testimony; and (2) that counsel failed to cross-examine petitioner's brother with a prior inconsistent statements. Joe Cunningham testified at trial that petitioner told him there was a dead girl in petitioner's apartment who he thought had overdosed on drugs; yet, Joe gave two statements to police, and one to a private investigator, prior to trial to the effect that petitioner came to his bar to obtain spare keys for petitioner's apartment and that the two of them found the body when they went there.

Petitioner argues that counsel was not prepared to impeach Joe Cunningham with his prior inconsistent statements and, accordingly, that counsel's failure to seek a continuance to obtain such evidence (i.e., the prior statements made to police) amounted to ineffective assistance. In petitioner's words, "had trial counsel requested a continuance and obtained and presented evidence that the

14

testimony of Mr. Joe Cunningham was faulty and inconsistent, a reasonable probability exists" that the outcome would have been different (Docket #3, Memorandum of Law at 17). Petitioner argues that counsel should have requested a continuance and requested discovery under Brady v. Maryland, 373 U.S. 83 (1963). The Superior Court found that because Brady only requires the release of evidence favorable to the accused, a request under Brady would have been unavailing (Superior Court Opinion of September 8, 2003 at 6). This is an accurate statement of federal law.

To state a valid Brady claim, a petitioner must show that the evidence was (1) suppressed, (2) favorable, and (3) material. 373 U.S. 83. In this respect, evidence is material where a reasonable probability exists that the outcome would have been different had the evidence been disclosed. Riley v. Taylor, 277 F.3d 261, 301 (3d Cir.2001) (en banc). Here, Petitioner is arguing that unfavorable evidence should have been disclosed, which does not satisfy the federal standard. The state court correctly found that Brady is not implicated because the evidence was neither favorable nor likely to have changed the outcome if disclosed.[7] Failure to pursue a meritless issue is not deficient performance under Strickland.

Petitioner also claims that counsel failed to impeach Joe Cunningham with the statements he made prior to trial. Petitioner complains that although the inconsistencies were explored by the prosecution in its direct examination of Joe Cunningham (Notes of Testimony at 62), his counsel did not make further inquiry and did not attempt to impeach on this basis.[8]

The Superior Court reviewed this claim on appeal from the denial of the PCRA motion and concluded that the claim was without merit as "the record reflects that Walsh's cross-examination did

---

[7] Further, Petitioner concedes that the statements **were** disclosed. Petitioner himself indicates that all three of the statements made by Joe Cunningham prior to trial were actually made available to trial counsel (Docket #3, Memorandum at 15). The two statements taken by police were provided in discovery, and the final statement was already in counsel's possession (Id.). Thus, there was no violation of Brady in this case, and a motion by counsel premised upon Brady would have been unavailing. Counsel did not render ineffective assistance in failing to file such a motion.

[8] Importantly, this is not a situation where the fact of the prior inconsistent statements was withheld from the jury.

15

in fact address the inconsistencies between Joe's pre-trial statements and his testimony. Transcript, January 24, 2000, at 67." Docket # 11, Superior Court Memorandum, dated September 8, 2003. A review of the transcript reveals that defense counsel asked Joe if his version of events had remained consistent over time, Joe indicated that it had, and defense counsel did not pursue any further questioning in this regard.

Fatal to petitioner's claim is his inability to show prejudice from his attorney's failure to pursue the inconsistency in his brother's statements. It is difficult to discern how petitioner suffered the requisite prejudice in light of the overwhelming evidence of his guilt (including his videotaped confession). Even if defense counsel had done more to point out to the jury that petitioner's brother changed his version of events to one which made petitioner appear more culpable, this would not have served to explain away any of the overwhelming physical and circumstantial evidence, nor would it have invalidated petitioner's confession to police. Without establishing that the outcome at trial would have been different but for counsel's alleged ineffectiveness, petitioner's claim of ineffective counsel in this regard fails.

Next, petitioner asserts that counsel was ineffective for failing to object to the trial court's instructions on the elements of third degree murder. Specifically, he argues that the court left the jury with the impression that third-degree murder involved an unintentional killing only, when it should have instructed that an intent to inflict serious bodily injury would also qualify as third-degree murder. Thus, in petitioner's view, had the jury been properly instructed, it may have returned a verdict of third-degree murder rather than second-degree murder.

As a general matter, states are free to set definitions of criminal offenses. Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997). "However, once the state has defined the elements of an offense, the federal Constitution imposes constraints upon the state's authority to convict a person of that offense." Id. Specifically, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, a "jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of an offense beyond a reasonable doubt,

16

thereby violating the defendant's federal due process rights." Smith v. Horn, 120 F.3d at 415; see also Sandstrom v. Montana, 442 U.S. 510, 523 (1979). In this respect, jury instructions only become constitutionally defective when there is a *"reasonable likelihood* that the jury has applied the challenged instructions in a way that violates the Constitution." Smith v. Horn, 120 F.3d at 411 (emphasis in original) (quoting Estelle v. McGuire, 502 U.S. 62, 72, (1991) and Boyde v. California, 494 U.S. 370, 380 (1990)). A court's analysis of challenged instructions "must focus initially on the specific language challenged." Smith v. Horn, 120 F.3d at 411. After that, the "allegedly constitutionally infirm language must be considered in the context of the charge as a whole." Id.

In this case, the Superior Court reviewed the challenged instructions in some detail. The Superior Court found that both during the initial instruction, and during the instruction following a jury question, the trial court properly informed the jury that third degree murder in Pennsylvania is "an unintentional killing with malice" (Docket # 11, Superior Court Opinion at 8-9). The Superior Court found this to be precisely in line with Pennsylvania precedent defining third-degree murder as a "'killing [which is] neither intentional, nor committed during the perpetration of a felony, but when there is malice aforethought.' Commonwealth v. Bigelow, 611 A.2d 301, 304 (Pa.Super. 1992)." Id. Indeed, a review of the applicable portions of the charge and petitioner's challenges thereto evidences that Petitioner is simply incorrect in his description of the court's charge. The trial court properly defined the crime for the jury both during the initial charge and after the jury's inquiry.

Therefore, there is no inaccurate instruction as a matter of state law. It follows that there is no reasonable likelihood that the jury's application of the instruction could possibly violate the Constitution. Counsel's performance in failing to object was not deficient under Strickland as such an objection would have been fruitless. Petitioner is not entitled to habeas relief in this regard as the state court's determination is not contrary to or an unreasonably application of federal law.

### 4.     **Certificate of Appealability**

Section 102 of the Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2253(as amended)) codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a]

17

certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong..." Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000). A petitioner meets this standard if he can show that the issue "is debatable among jurists, or that a court could resolve the issue differently, or that the question deserves further proceedings." McCracken v. Gibson, 268 F.3d 970, 984 (10th Cir. 2001). Under 28 U.S.C. § 2253(c)(3), the district court must identify which specific issues satisfy the standard.

As Petitioner has not met this standard, a certificate of appealability should be denied.

## CONCLUSION

Wherefore, on the basis of the foregoing, it is respectfully recommended that the instant petition for writ of habeas corpus be dismissed and that a certificate of appealability be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

    /s/Susan Paradise Baxter
SUSAN PARADISE BAXTER
CHIEF UNITED STATES MAGISTRATE JUDGE

Dated: March 9, 2006