IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


WILLIAM JOSEPH CUNNINGHAM,  :
     (Petitioner)         :  Writ Of Habeas Corpus
                         :
       v.            :  Civil Action No. 04-119 ERIE
                         :
WILLIAM STICKMAN,       :  District Judge Sean McLaughlin
RAYMOND J. SOBINA, et al., :
     (Respondents)    :  Magistrate Judge Paradise Baxter

## Affidavit

PETITIONER'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Commonwealth          :
Of Pennsylvania      :  SS
Forest County        :

TO THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA:

    I, William J. Cunningham, do hereby swear that all statements here made are true and correct to the best of my knowledge, so help me God.

### I. INTRODUCTION

1)    Pursuant to title 28, §2254, I herein present my Objections to the Report and Recommendation ("Report") of Magistrate Judge Susan Paradise Baxter filed on March 9, 2006. I argue that the perusal of the below sworn statements is pertinent for this Court to correct the Miscarriage of law and constitutional violations that were predicated on the prejudice facts of the prosecutor that was adopted as the "Record" that was used to convict me, that now correcting the history will determine my "actual" innocence.

### II. OBJECTIONS TO THE PROCEDURAL HISTORY

2)    The summarized evidence in the "Report" is an illustration of the period of events that led to the strangulation death of Patricia Fletcher. There are a numerous facts from the record that were put

-1-

together by the prosecutor and adopted by my appointed counsel. The "procedurol history" is an obscured record that deprived the jury of the facts during trial and deliberation.

3)     The <u>PRE-TRIAL-MOTIONS</u> filed on October 13, 1999, one is a motion petition for habeas corpus relief, one is a motion to surpress statements, and one is a motion for change of venue and venire. This hearing was unconstitutional, for the fact that my state of mind and body due to intoxication should have been determined by the trial jury and not the judge. I allege that the hearing was not only illegal, but was the stage used to convict a known innocent man.

4)     Had the jury been the fact finder of the state of my intoxication it would have determined the absolute law of nature that in my state of intoxication I would not be able to have an erection and I'd be unable to perform the act of sexual intercourse. Thereby not being able rape the victim. In addition it would have deprived me the physical ability to inflict the savage injuries that caused the strangulation death of Ms. Fletcher.

5)     My condition regarding the above mentioned facts concerning this case, if it was shown to the jury it would have defeated the actions by rendering a legal prejudice. An act which in no way contributed to the result of rape and injuries that I cannot be the cause of it. I have a long history of alcoholism that the Policy Department, Arresting Officers, and the Trial Court were all familliar with.

### III. <u>MY STATEMENT OF THE FACTUAL HISTORY</u>

6)     On wednesday, June 30, 1999, at approximately 10:00 a.m. my friend Scott Greenman picked me up at my apartment at 1809 Treetop Drive, apartment 5-B. We drove to his house at 14537 South Main, Mill Village, Pa. We did yard work in the morning, later we did work on Scott's truck in

his garage where I received many cuts and scrapes including a deep cut on my right thumb. Later in the afternoon I had a picnic with his family and friends.

7)    About 8:00 p.m. I returned home and found my brother Tim who had been staying with me for the last week, during which time we did a lot of drinking . Tim left two six packs of beer in the refrigerator for me to drink. After Tim left I drank about eight beers before I put a pizza in the oven for dinner.

8)    While the pizza was cooking I fell asleep. Sometime around 1:00 a.m. on July 1, 1999, I was awakened by the pounding on my door. It was a police officer named "Billie Jo Pierce", who was sent to my apartment because thought there might be a fire. upon entering my apartment Officer Pierce noticed the beer cans sitting in my kitchen-sink and she asked if I was on probation or parole. I informed Officer Pierce that I just got off parole twelve (12) days ago. Officer Pierce gave me a friendly warning about cooking whenever I have had too much to drink.

9)    After the officer left I went back to sleep and got back up at around 9:00 a.m. that morning and drank the last four beers in my refrigerator. I left my apartment on foot around 2:00 p.m. and I was heading over to my sister's house. I stopped at the Lonestar Steakhouse and Saloon. I only intended to have a quick lunch before I cought a city bus over to my sister's house. I ordered a burger and started drinking draft beer. I left the Lonestar Steakhouse and Saloon around 6:30 p.m., after the bartender said he could not serve me anymore because he felt that I was starting to get too intoxicated.

-3-

10)    I got on a city bus and I got off at Shenanigan's Grill and
Bar, Peach Street, Erie. I stayed at Shenanigan's from around 7:00
p.m. to around 9:00 p.m., where I consumed not only beer, but also
a few shots of whiskey. I don't remember if I called a taxi-cab or
the bartender did, but I remember sitting in the front of a taxi-
cab drinking a beer asking the driver to take me to a good place
to drink. After a short period of time in the taxi-cab the driver
dropped me off at a bar on Parade Street, Erie, Pa. I went in and
started drinking. I remember being tired and falling asleep at the
bar.

11)    I was wawkened by a black femal and her friend. I remember
looking up at the clock on the wall and it was around 10:00 p.m. I
bought both of them numerous drinks, everytime I did she would kiss
me. Sometime in our conversation I asked them for a ride home. They
agreed and we left sometime after midnight and I gave them twenty
dollars for gas money.

12)    At this time I had no idea where they were going. They stopped
somewhere on German street where she got out of the truck, and a short
time later she came back and stated that she bought crack cocaine. While
waiting, her friend told me that she woluld give me oral sex whenever we
got back to my apartment. On the way to my apartment I asked them to
stop to pick up some beer, which I gave him the money for, and then he
stopped somewhere and purchased four six-packs.

13)    During the ride to my apartment she was putting her hand down my
shorts, and she even took my hand and placed it in her pants trying to
get me sexually aroused. But because I was so drunk at the time, sex
was the furthest thing from my mind. After being unable to arouse me
she stopped bothering me about it.

-4-

14)    Upon arriving at my apartment sometime around 1:00 a.m., the two of them sat in my kitchen where they smoked crack cocaine. I did my usual routine of taking my leg off, and put my wallet and money in my dresser drawer, turned on the stereo etc., then sat down with them and drank some beer.

15)    Shortly after we got to the apartment, I gave my keys to the guy because for some reason I left my cigarettes in his truck. He then left and went outside to get the cigarettes. She then talked me into taking a hit off the crack pipe. When I did, I got really sick and went to sit on the couch where I passed out.

16)    It wasn't until late morning on July 2, 1999, that I woke up on my couch and my beer was still sitting on my coffee table half full, the stereo was turned off and I thought everyone had left. As I was going into the bathroom to put my leg on, I noticed a black women laying on my bed. I put my leg on, came straight out of the bathroom, noticed a pair of womens' shoes under my kitchen table, so I picked up the shoes and I went into the bedroom and turned on the stereo next to the bed thinking that would wake her up.

17)    As I got close to her I noticed that she was not breathing and I thought that she might of taken an overdose. Not knowing what to do, I placed her sweatpants that were laying on the floor over her crotch. I started to panic, whent into the kitchen where I noticed the drug parap-hernalia on the kitchen table along with a few beer cans.

18)    I then threw the beer cans in the kitchen-sink and took the drug paraphernalia to the community laundry room, located inside the same building complex. It was raound this time that I realized I did not have the keys to unlock the apartment door. I remember giving them to the

guy that gave me a ride home the night before. Not knowing what to do or who she was. I could not remember if she was the same girl, the couple, that gave me a ride home.

19)    I panicked, left the apartment building, walked down to Peach street towards the Millcreek Mall because I needed to get out of the house to clear my mind. I was still drunk and in shock at this point. I went to Wendy's Restaurant and tried to call my brother Joe , his wife Belinda answered the phone both times and told me that Joe had gone to Union City, Pa. that morning to get some brakes put on his daughter's car and him and Brandy were going out looking for another car for Brandy to buy. Belinda told me to try calling back again in about an hour or two.

20)    I went inside Wendy's, as I was about to order the person that was behind the counter told me that they just stopped serving break-fast. I just ordered something to drink and sat down for awhile. Then I went back to the phone and tried to call Joe again, but got no answer, so I called my sister Sherry's house and got ahold of my little nephew, but he told me that Sherry and Jeff went to the Erie Peninsula to ride their bikes. I then tried calling my best friend Scott Greenman twice, but never did get an answer because nobody was home.

21)    Unable to get ahold of anyone I went across the street to the Millcreek Mall. I with drew a couple hundred dollars from the Mack-Machine and started to drink again. I was at the Mall drinking all day long at Ruby Tuesday's, Roadhouse Saloon and another bar I can not remember the name of. I left sometime in the evening around 8:00 p.m. on a city bus and went to another bar named the Starlight Motel that is located on west 4th street.

22)    I left the starlight Motel sometime after 1:00 a.m  (July 3, 1999)
to go to my brother's club Kandyland[1] by tax-cab. I got to Kandyland
sometime around 2:00 a.m. My brother was doing a security check in the
parking lot. I told Joe that I had a serious problem that I needed to
talk to him about. He told me to go inside and wait for him and he'd be
right in. As I entered the club Joe's wife Belinda greeted me at the
front door. She could see that something was wrong with me right away
because of the look on my face and asked me what was bothering me. I
told her that I had a dead girl in my apartment. I told her that I did
not know who she was, or why she was laying in my bed dead.

23)    Belinda ran outside to get Joe and when he came back into the club
I told Joe all that I remembered the same way that I told everything to
his wife Belinda. That I was locked out of my apartment building because
the guy took my keys. Joe called our brother-in-law Jeff Jageman because
I gave my sister Sherry Jageman a spare set of keys to my apartment. Jeff
brought the spare set of keys to the club.

24)    When he got there we all talked in the kitchen of the club. Joe
told Jeff what I informed him and Belinda about that night concerning
the dead black women being found dead in my bed and being left there for
so long without reporting this matter to the police when I found her. Joe
told Jeff not to worry because he'd keep Jeff's name out of the picture
by telling the police that he had the other set of keys to my apartment,
and that he got them for me whenever he went home to get his truck becau-
se Joe had to drive his wife home in the sports car that he drove to the

---

[1] Kandyland is an adult club with nude dancers. It is a dinnertheater that has nude
waitresses. They have totally nude dancers and private lap dancing there too. It's
a place known very well for prostitution and drugs.

club that night.

25)    Jeff, Joe and Belinda, and George and me all went out to Joe's
house and made the exchange on the vehicles. At Joe's house George was
telling Joe not to get involved in this situation because it might hurt
their business at "Kandyland" somehow. Joe and Jeff told me not to tell
the police that I left a dead women in my apartment for so long without
calling the police to report the death of this poor women.

26)    Joe and I left his house and headed to my apartment. When we got
to my apartment Joe looked at the dead women laying in my bed and said
that she looks like she just layed down and went to sleep. After Joe
saw what the situation was, and that there was a dead women at my house,
he said what are you going to do brother Bill and I said I guess that
I'm going to call (911) now.

27)    Right after I called the police to report this matter Joe and I
went out in the front of the apartment building and waited for the
police to arrive. The police arrived at my appartment within minutes.
Just before the police arrived Joe kept telling me to make sure that I
stick to the story about getting locked out of my apartment so I would
not get in any kind of trouble for not reporting this when I found her.

28)    When the police arrived at my apartment the first thing she said
was "weren't we just here the other night!" to her partner. I showed
the first two police officers on the scene into my apartment. Officer
Pierce was the first one to go into my bedroom to see the dead women
laying on my bed. The next thing I remember is Officer Pierce telling
me to write a statement about what led up to me finding this black girl
laying dead in my bedroom half naked on my bed. I also remember her
telling me that if I couldn't remember exactly everything about that
night in question then I could just write down whatever I do remember.

I told her that I was drinking from earlier that morning and I did not stop drinking until it was almost closing time at the bars. I don't remember exactly what else I told her but I do remember telling her something about the guy taking off with my keys whenever I sent him out to get my cigarettes and lighter from his truck. I also told this officer about those strangers doing crack cocaine in my kitchen the night before. I told her that I thought the guy might of been a pimp because he kept pushing his girlfriend on me. I told her that I knew that they were trying to get money off me for more crack cocaine, but I kept telling this girl that I was not interested at all about having any kind of sex with her because all that I wanted to do was have a couple of beers and then go to bed.

29)    As I was talking to this officer I remember there was a lot of police running in and out of my apartment. After I finished writing the statement she said that we could wait outside while they were taking care of everything in my apartment.I told her that I thought that I was going to be sick when we got outside I got on my knees in the grass and I was ready to vomit at that point in time. She told me that it was just my nerves from all of the excitement that morning and that I'd be okay.

30)    She also asked me about the beer cans that were in my kitchen-sink when we were outside too. I asked her and the detective many times where my brother Joe took off too. Her and that detective told me that they told Joe to go ahead and go home because they had to take me down to the police station for a formal interview. They told me that I could call Joe for a ride home whenever they got done with my interview. They said that I might want to go over to Joe's house to stay for awhile because of what was going on at my place.

30)   The ride to the police station was very intense because these two detectives were pumping me for information that I just didn't have the answers to and they kept it up the whole way to the police station. I I kept telling them the same thing over and over "that I didn't know what happened to this women and how she ended up dead in my apartment." I did already inform these two detectives on the ride to the police station that I did already know about this women being dead in my apartment and that I wasn't completely honest with them because I really didn't get locked out of my apartment. I told them I was terrified when I found this girl and didn't know what happened to her, or know why she was even still in my apartment. I also told them it was Joe's idea to tell them that story. I was pissed-off because Joe just took off and he wasn't there to comfort me in my time of need. I always felt that he just handed me right over to the police to save his own ass. I did not want to go anywhere alone with these two detectives and I thought that I had no choice in the matter. They didn't ask me to go to the police station with them. They told me that I was going to the police station with them. I only road along with them because they tricked me into it. When I was in the detective's car the two detectives in the front seat were asking me a lot of questions like who is this women? What is her Name? Why is she laying in your bedroom dead and was she your girlfriend? They told me that they didn't believe there was another "guy" involved and that I was just making that up. They told me that this women was seen walking around in that building complex earlier that week and they knew that she was staying with me in my apartment too. I must of told them one hundered times that I didn't know these two people at all and that I didn't have anything to do with women being found dead in my apt.

-10-

31)    The Millcreek Township Police Department's main investigating detective, after questioning me at my residence for several hours, and on the ride to the police station, without providing me with my Maranda Rights, took me to the police station and again questioned me, after they induced me to wave my Maranda Rights at the police station and then, claimed that I confessed per taped confession at their police department whereby the main investigating detective, after many, many cursory and slanderous remarks said "You could of commited the offenses!", and I responded saying, "Yes I could have committed the offenses but, I didn't!" As I was only repeating what the detective had said. However, the scene was videotaped and used at my trial to convict me for crimes that I did not commit.

### III   OBJECTIONS TO THE COURT APPOINTED COUNSEL

32)    The above statements, see para. 6 to 31, is my testimony. The testimony that was withheld from the jury. A Constitutional violation accomplished by the "Judgeism"[1]. A conspiracy that among others included Judge Ernist J. DiSantis Jr., my appointed counsel Joseph M. Walsh, III, my appointed appeal counsel Joseph P. Burt, prosecutor Garrett Taylor, the assistant district attorney, Detective Michael Kabasinski, Millcreek Police Department, here after referred to as the "Police".

33)    It is here alleged that this conspiracy acted to convict me in a showing of support, for the "State Monarchy", an established Rico Enterprise. In which one of the primary activity is dealing in obscene matter and dealing in narcotics or other dangerous drugs.

---

[1] "Judgeism" —— The practice of law that by a system of principle rules deny the jury a constitutional privilege and judicial power as to law and fact of the crime within its community. With this process it has established a doctrine of Common law instituted by Judges that deprive the Constitutional Guarantee, Immunity and Privileges of the U.S. Citizen it Governs and Usurps the Supreme Power of Representation.

In which activities I am alleging that some of the witnesses in this action sitting before you are associated with.

34)    From the onset, of the "police" arriving at the scene, I was labeled as the perpetrator, by their actions in my treatment as a witness, in comparison to the other witnesses. During the interview, I was manipulated into a deceived confession, contrived by the "police" and Mr. Kabasinski.

35)    After I was trapped in the above weir, the "police" formally arrested me. Thereafter, I was appointed counsel, a public defendant, Joseph M. Walsh, III, by the court, Judge DiSantis an active partisipant.

36)    After my arrest I was placed in the Erie County Jail awaiting my trial, where my paranoia of Jail and the Law and practice of the State, one such as myself must have a lawyer to represent him in court. Which led me to rely on the advice of the appointed counsel.

37)    Mr. Walsh refused to allow me to testify at the hearings, trial and speak about my innocence in my defense. Refused to call witnesses on my behalf and introduce evidence of my actual innocence. Refused to interrogate hostile witnesses, such as Joe Cunningham, Gary Adams, Lisa Gore, and Paula Rust.

38)    Now, I realize he did his job as an associate of the "Judgeism" who delivered me to the gallows at the Erie County Courthouse, where spared by Judge DiSantis who nailed me to the cross, a life in State prison, upon being convicted by the stupefied Jury, where the mass under fear applauded.

39)    At the sentencing Proceedings was where for the first time I was allowed to declare my innocence and made my appeal wish known. It was at this proceeding where the Per Curiam of the "Judgeism" gave me the permission to speak.

-12-

It also made me sign the defendant's aknowledgement of Post Sentencing rights, which my attorney Mr. Walsh took, assuring me that he would proceed with my appeal.

40)    Because of my strong belief in my actual innocence and my wish to appeal, Mr. Walsh filed the "Post-Sentence Motion/Motion for New Trial and In Arrest of Judgment", on March 7, 2000, along with his Petition to Withdraw as Counsel, in the event the Post-Sentence Motion was Denied.

41)    Mr. Walsh stated in his Petition to Withdraw, that's because he "was Court appointed" to represent me, if the Court refused the Post-Sentence Motion, he respectfully requested the Court to Grant an Order Allowing him to Withdraw from the case, and appoint Joseph P. Burt, of the Erie County Public Defender's Office, to take over my representation.

42)    It is alleged that Mr. Walsh being appointed by the Court was actually working for the interest of the Court. Thereby he prejudice me in my defense and caused the jury to find me guilty.

43)    It is the above "Cause" and "Prejudice" that shows that a fundamental miscarriage of justice resulted from the usurp representation. A Constitutional Violation that resulted in my conviction, although I am actually innocent.

44)    The Usurp Representation, caused the lack of defense on the part of my appointed counsel Mr. Walsh at the Preliminary and Supression Hearing caused the Court, Judge DiSantis, to adopt the Opinion of the police officers that prejudice me.

45)    The above "Cause" and "Prejudice" the result of my representation, usurped by the appointed counsel, that is obscured by the appeal process and the action of Judge DiSantis using the appointed counsel that prejudice my appeal right and caused me to derailto the direct appeal track, that supports the "Judgeism" of the State.

46)    Now, I realize that the "acknowledgement", I signed at sentencing, is the obscured document that returns the usurped representation, seized by the "Judgeism", to me for the process of my right to appeal. In this process I am the representative of myself, who is responsible for the appeal direction of the action.

47)    The practice of the appointed counsel described above in para. 32 to 46 abandon me at "Sea"[2] in the prison chamber to find my way out, or in the words of Judge DiSantis, "my only way-out of prison is going to be in a body bag." The prison is filled with human beings, who are unable to "walk on water", rely on the "correctness" of oneself to accept the responsibility of the "Judgeism".

48)    Although at "Sea" the practice of "Law", is reserved exclusively for the representative Attorney at Law. In prison their are "Jail House Lawyers", who are allowed to practice law and assist inmates on their "Direct Appeal", returning them to the sentencing Judge on P.C.R.A., asking for forgiviness and accepting "Judgeism", as their "Savior".

49)    All my filings accept those filed by the appointed counsel on Direct Appeal and P.C.R.A., were prepared with the assistance of a "Jail House Lawyer". Including The Petition for Writ of Habeas Corpus, No. 04-119 ERIE. In essence the reason for restating the claims of Procedural Default without Establishing Cause for it. Now, in this Affidavit, I have received assistance from inmate Gaetano Dianese in bringing into view the fundamental Miscarriage of Justice that prejudice my actual innocence.

---

[2] "Sea" — The vast emptiness space with many chambers, where all human animate in search of one soul the representative of one body.

## IV.    ALIBI

50)    On numerous occasions in the morning of July 3, 1999, I told the "police", and detective Michael Kabasinski that I was drinking alcohol for the past several days,"See Preliminary Hearing" page (14), lines (11-13), "He did indicate to me that he had been drinking the previous night, the previous day and the previous night before that." Paragraph (15-16), I stated "went to sit on the couch where I passed out." It wasn't until late morning on July 2, 1999, that I woke up on my couch.

51)    The Absolute Law of Nature dictates that a person such as myself, who has been drinking for that length of time will eventually pass out. And due to my intoxication level I was certainly unable to perform sexually, thereby rendering me impotent and unable to commit rape. I was refused service at around 6:00 p.m. on July 1, 1999, because the bartender thought I was intoxicated already. Then I proceeded to drinking right on up til 1:30 or 2:00 a.m. on July 2, where I passed out on the couch. Hut's Place was the last bar that I was at on July 1, 1999. Hut's bartender testified that I was falling asleep at the bar at 10:00 p.m., on July 1, 1999, and continued drinking up until I left at around 1:00 a.m. July 2, 1999.

52)    The otopsy and testimony of Dr. Eric Lee Vey places the death of Patricia Fletcher between the hours of 4:00 a.m., and 7:30 a.m., on July 2, 1999, See T.T.P. (135), Lines (1-2-3), "The death occurred roughly about 36 hours prior to the performance of the otopsy."

53)    The testimony here presented, I state that I was asleep between the the hours of 1:30 a.m. and 2:00 a.m., until approximately 10:00 a.m. on July 2, 1999, when I first woke up and found the victim. The testimony of the neighbor placed the noise in my apartment between the hours of 1:30 and 2:30 a.m. on July 2, 1999, which does confirm with mine, and Gary Adams testimony of the time we arrived at the apartment

-15-

when Laura Caracciolo heard the noise in my apartment.

54)    The testimony of Gary Adams, Joe Cunningham, and myself, confirms
the others had keys to my apartment and were able to return while I was
sleeping/passed out, to commit the crime, or to deliver the body and
create the scene of the crime. Gary Adams also testified that he got rid
of the keys to the crime scene the morning of the murder even though the
murder wasn't reported until 24 hours later, approximately 12 hours after
he got rid of the keys, implying that he definitely knew something. I am
alleging that Gary Adams kept the remaining 3 keys as part of his alibi,
that he was not able to get back into the apartment.

55)    Therefor I was prejudiced by the "Police" not investigating my
alibi, even though they were aware of my drinking and had witnesses who
saw me at different drinking establishments and knew and testified that
I was falling asleep. I was also prejudiced by my counsel who refused to
use my alibi as a defense, and prejudiced by Judge DiSantis who excepted
the opinion of the "Police" without evidence to support I was not drunk.

### V.   THE USURP REPRESENTATION PROCESS

56)    On July 3, 1999, between the hours of approximately 4:00 a.m., and
9:30 a.m., I was deluded into relinguishing my representation power, to
the intimidation authority of the Law enforcement official Mr. Kabasinski
and others, who drilled me until I uttered a "word", that Mr. Kabasinski
was able to opined to the "Judgeism", that I confessed.

57)    At approximately 9:30 a.m., July 3, 1999, I was arrested, thereafter
my relinguished representation was turned over to the Erie County Court,
who then appointed Mr. Walsh to retain my representation. Because of the
usurp representation I was not allowed to speak at the Preliminary
Hearing on 8/3/99, the Supression Hearing on 10/13/99 and the Trial on
01/24/200.

That was an Unconstitutional process by which the "Judgeism", usurp my Privileges and Imminunities.

38)    At the Sentencing Proceedings on 02/29/200, I was first given the Defendant's Acknowledgement of Post Sentencing Rights, a document used by the "Judgeism", to discreetly replace my usurp representation placing the obscured Right to Appeal process in my domain in which I can exercise my Right to Self Representation.

59)    Therefor, I was allowed to speak to the Court about my innocence and my wish to appeal. Then on 03/07/200, Mr. Walsh filed a Post-Sentence Motion and Petition to Withdraw, a process by which my representation was divided. I retained the representation on the Right to Appeal and Mr. Walsh relinquished the representation on Direct Appeal to the Court, Judge DiSantis, who then relinquished it to Mr. Joseph P. Burt. This was all accomplished on 03/07/200 with the Denial of the Post-Sentence Motion Granting the Motion to Withdraw.

60)    On 03/13/200, Mr. Burt filed a Notice of Appeal. Although the Appeal Notice is a proper representation of my wish to appeal to the next Court, (The Supreme Court of Pennsylvania) it is a delusional document that gave me the impression that Mr. Burt was handling my Appeal Right.

61)    To add to the delusion process Judge DiSantis issued an Order on 03/14/200, asking for the "Statement of Matters", which made me feel that that my appeal rights were being exercised. Mr. Burt then filed a Preliminary"Statement of Matters Complained", a delusional document used to divert my attention from my right to appeal, a process that I was responsible to effect.

62)    Thereafter, the appeal sat quietly at the Superior Court, until the experation of the 120 days, on which day was approximately 07/10/200.

The Post Sentence Motion, the carrier of my appeal right, was denied by operation of law. A presumed Order for the purpose of appeal that triggers a new 30 day period in which to file a Notice of Appeal to a Higher Court. After the experation of this 30 day appeal period the appeal is lost.

63)    During this 30 day appeal period Mr. Burt files a "Final Statement of Matters Complaint", identical to the "Preliminary" one on 07/20/200. Then on 07/28/200, Judge DiSantis files his "Memorandum Opinion", all in the time frame to delude me from my representation to my appeal as a right.

64)    Sometime after the Expiration of my Appeal as a Right is lost approximately around 08/08/200, the Clerk of the Superior Court Ordered a Briefing Schedule. Mr. Burt files a "Brief For The Appellant", on 10/6/200. Brief For The Appellee filed by Mr. Garrett Taylor on 12/05/200. All as a Faux to Justice in Support of "Judgeism".

65)    Because The Superior Court of Pennsylvania is a member of the "Judgeism", hierarchy is left with the only option to adopt the Trial Court Opinion Establishing Common Law that Supports the "Judgeism".

66)    Because the Appeals arrived at The Supreme Court on "Direct", the "Judgeism", Ruled the Courts' only option is to deny the appeal by PER CURIAM ORDER.

### V.    ARGUMENT

#### 1. EXHAUSTION AND PROCEDURAL DEFAULT

67)    The first argument of exhaustion the Report and Recommendation (R.R.), has deemed it eccused on the ground of futility.

68)    Although the State Court decision was based on the State Law the procedural was based on the Federal question of representation, it was not "independent" because the U.S. Constitution Guarantees a Republican form of Goverment, See, U.S. Conts., A.IV, Section 4, A system of Government in which the people hold sovereign power of representation.

69)    The decision was not "adequite" to support the judgment, because it was based on the material fact of Detective Kabasinskis' opine that I was not intoxicated and that I confessed along with the restraint of my representation held by attorney Walsh rendering me defenseless.

70)    The cause for the default is the law and the practice that in Pennsylvania the law enforcement official has a "title of nobility" and are looked at in a way that they do no wrong, that they are "Morally-Good" by the other law enforcement officers. In this case the testimony of Detective Kabasinski opined that I was not intoxicated was seen by Judge DiSantis as "morally good", held to a noble status because he was a local law enforcement officer.

71)    The above is a Constitutional Violation, see article I. section 10, "No State Shall...Grant any Title of Nobility", and article IV., section 2, "The citizen of each State shall be entitled to all Privileges and Immunities." Because the State relinquished the sovereign power to grant any title of nobility upon ratification, one law official can not hold the opinion of another law official to a higher rank than a citizen.

72)    Therefore, can not convict a citizen soly on the testimony of a law official. Such was the case until me at the Preliminary Hearing and Suppression Hearing, and ultimately at trial. Judge DiSantis accepted the opinion of the police officers that I was not intoxicated, then at trial accepted the opined of the police officers that I confessed, when in actuality I most certainly did not. In addition the transcript of the videotape would have been evidence that the jury would have had access to during deliberation.

73)    The failure to consider my claim of actual innocence will result in a fundamental Miscarriage of Justice. Wherefore, "counsels'" perform- ance not only failed to meet the Sixth Amendment Standard, a "Judgeism" tool, but actually usurped the Sovereign Power relinquished to me, a citizen of a Republic Form of Government. In doing so it undermine the very basis of our Union.

## 2. MERITS

74)    Had the evidence of intoxication along with the hostile witness, such as Gary Adams's history of "schizophrenia", along with his history of "domestic abuse" and the alleged action that "Gary used his hands, or fists to harm (the victim) Ms. Fletcher." See, (Police Report) suppleme- ntal/Fitzpatrick-Rogers 99-972, 20 AUG. 99, Detective Gary Rogers, and a full transcription of the videotape along with my testimony no reasonable juror would have convicted me.

75)    The merits were deliberately withheld from the jury by the suppres- sion hearing and the appointed counsel Mr. Walsh. Contrary to the Supreme Court Established Federal Law that the fact of the witnesses/suspect state of mind as to the truth of the statement needs to be determined by the jury. Withholding the facts from the jury undermines the base Constitutional Immunities of Freedom, Equality, Justice, and humanity that are the fundamental principles of a republic in which the sovereign are held by the people and is for the people to determine the Law and the Facts of the case. See, U.S. Const. Art. IV, Section 4.

## 3. SUFFICIENCY OF THE EVIDENCE

76)    As a citizen a rational trier of the facts I find the essential elements of the crime beond a reasonable doubt indeed overwhelming. The injuries and condition of the deceased all point to the savage, but the question that the evidence does not answer, who is the savage killer?

77)    The Commonwealth had no evidence to establish that I was the "Savage" other than the victim was found on my bed. A bed that others had access to the night of the murder. The opined expression of the law enforcement officials, all Unconstitutional and a gross Injustice of our Republic. A Constitutional Mockery by which the "Judgeism" has Granted Title of Nobility to the Law Enforcement Officials in Direct Violation of Article I., Section 10.

## 4. CHANGE OF VENIRE

78)    Although the media is an exellent source of information , in my case it was used to stupefy the venire. It showed the presumed "correctness" of the law enforcement, by the bias practice of only showing the side of the officials , who labled me the "Savage".

79)    The media affect the Community engender atmosphere to presume the law enforcement officials to be morally superior. A social class set apart by higher rank. Numerous times the news media showed Judge William Rusty Cunningham of the Erie County Court, repeatedly stating that he was not related to me and Justice will be served, for the black Community not to be in arms, implying his noble rank. Had I been allowed the use of the media, the jury would not have been stupefied and the mass not afraid of the "evil", that the law enforcement portrays it protects the citizens from.

80)    With the change of venue claims and the news paper articles, I submitted, was to demonstrate the hostile atmosphere, the pervasive process by which the "Judgeism" deprives the people of our proud public. A process used to support the "State Monarchy", by allowing the associates to deal in illegal activity.

81)    Prosecuting innocent citizens such as myself. A propaganda in
of the "Judgeism Democratic Agenda", by which the people sovereign
power are usurped. A Constitutional Violation of Article I., Section
10, Clause 1., Article III., Section 2. Clause 1 and Section 4.

### 5. INNEFFECTIVE ASSISTANCE OF COUNSEL

82)    THE INNEFFECTIVE ASSISTANCE OF COUNSEL IS WELL FRAMED THROUGHT
THIS AFFIDAVIT. But more specific in para. 32 to 49, in the "Objections
to the Court Appointed Counsel" section. As well as in "The Usurp
Representation Process" in para. 56 to 66.

83)    Thus the effect on my Constitutional Right of Representation, by
the inneffective assistance of counsel, goes beyond the unprofessional
errors, the adversarial balance between defense and prosecution that
rendered the trial unfair. But is the material fact upon which the
prosecution rested to guarantee the jury would render a guilty verdict.

84)    The first question to the two part test to determe the ineffective
assistance, is was counsels prformance unreasonable? Yes, not only
unreasonable, but their was none. Counsels' only purpose was to usurp my
representation and give the prosecution the clear sailing to the
verdict rendered.

85)    The second question is did the unreasonable performance of counsel
actually prejudiced the defense? Yes, counsel did prejudiced me with his,
no defense, but his presence was so serious that he was not functioning
"counsel" to me, but the bilwark for the prosecution.

86)    I have alleged that the "Judgeism" used the Common Law Right to
Counsel to Usurp the Sovereign Power from the People, a Constitutional
Violation. Therefore, for me to argue case law, from in most part
Common Law is derived, would be in support of counsel and not the
Constitutional Right to Representation, conforming to my wishes.

The Court's Inturpretation of the Sixth Amendment Right to Counsel is Misleading, because it only determins the performance as to an Attorney-atLaw rendering effective counsel.

87)   Not representing a defense may be a Lawyer Trial Strategy, but never the less, it denies a party Right to representation. It is the withholding of ones' representation that is Unconstitutional, which is exactly what Mr. Walsh, Mr. Burt, and others did.

## 6. CERTIFICATE OF APPEALABILITY

88)   I state that it is Unconstitutional for a Judge to Deny My Right to Appeal. Because the U.S. Constitution vest the Supreme Court with the Appellate Jurisdiction and the Writ of Habeas Corpus is a Constitutional Privilege, denying its appealability would result in a Constitutional Violation of, article IV, section 2, clause 1, and article Ⅲ, section 2, clause 2.

Respectfully submitted,

04/19/2006

By: _William J Cunningham_

William Joseph Cunningham  DC# EE-3603
SCI-Forest, Houseng Unit H/A 1016
P.O. Box 945
Marienville, PA 16239-0945
Petitioner, Pro Se.

_signature_
Gaetan Dionese
witness

Signature verified this _18_ day
of _April_, 20_06_.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Julie Schill, Notary Public
Jenks Twp., Forest County
My Commission Expires Sept. 30, 2009

_Julie Schill_

-23-

## CERTIFICATE OF SERVICE

I, <u>WILLIAM JOSEPH CUNNINGHAM</u>, petitioner in original Writ For Habeas Corpus and attached captioned matters, certifies on this day of April <u>19</u>, 2006, that I am serving a true and correct copy of the below document, upon the following persons in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure.

1.

### Affidavit
### PETITIONER'S OBJECTIONS TO
### <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

<u>SERVICE BY FIRST CLASS MAIL TO:</u>

One Copy:

Clerk's Office
United States District Court
Western District of Pennsylvania
P.O. Box 1820
Erie, PA 16507

Chad J. Vilushis
Assistant District Attorney
Erie County Courthouse: Room 301
140 West 6th Street
Erie, PA 16501

Susan Paradise Baxter
Chief United States Magistrate Judge
United States District Court
Western District of Pennsylvania
17 South Park Row, Room A280
Erie, PA 16501

Respectfully submitted,

04/19/2006

By: _William J. Cunningham_

William Joseph Cunningham  DC# EE-3603
SCI-Forest, Housing Unit H/A 1016
P.O. Box 945
Marienville, PA 16239-0945
Petitioner, <u>Pro Se</u>.

April __19__ , 2006

William Joseph Cunningham  DC# EE-3603
SCI-Forest  Housing Unit H/A 1016
P.O. Box 945
Marienville, PA 16239-0945

Clerk's Office
United States District Court
Western District of Pennsylvania
P.O. Box 1820
Erie, Pennsylvania 16507

      RE:   Cunningham, William v. Stickman / Sobina, et al.
           No. 04-119 ERIE (W.D. Pa)

Dear Clerk of Court:


    Please find enclosed the original document of Affidavit - Petitioner's
Objections to Magistrat Judge's Report and Recommendation, which has been
filed as of record this date on behalf of the Petitioner, William Joseph
Cunningham, in accordance with court order dated, 3/27/2006.




    "Thank-You!", for your time and services regarding this matter.



cc:  file

Susan Paradise Baxter

Chad J. Vilushis

Respectfully submitted,

By: _____

William Joseph Cunningham  DC# EE-3603
Petitioner, Pro Se.